UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E-GLOBAL ALLIANCES, LLC, | |
| Plaintiff, | **10 Civ. 2844 (KMK) (PED)** |
| - *against* - | **REPORT AND RECOMMENDATION** |
| ROBERT S. ANDERSON and E-TRUST CLEARING HOUSE KB., | |
| Defendants. | |

**TO:    THE HONORABLE KENNETH M. KARAS,
        UNITED STATES DISTRICT JUDGE**

## I.    INTRODUCTION

On April 1, 2010, Plaintiff E-Global Alliances, LLC ("EGA" or "Plaintiff") commenced

the instant action against Robert S. Anderson ("Anderson") and E-Trust Clearing House KB

("ETCH").  Docket # 1 (Complaint ("Compl.")).  This case arises out of a joint venture entered

into by Plaintiff and Defendants for the purpose of trading in the international monetary markets.

Invoking this Court's diversity jurisdiction, Plaintiff asserts various state law claims against

Defendants stemming from their alleged failure to distribute over €4.25 billion in profits

allegedly due and owing to Plaintiff in its capacity as joint venturer.

Plaintiff made numerous unsuccessful attempts to effect service of process upon the

Defendants in the manner called for under the Federal Rules of Civil Procedure.  When those

efforts proved unsuccessful, the Court granted Plaintiff's request to effect service by United

States Postal Service Express Mail.  Docket # 3.  When that alternative method of service also

proved to be unsuccessful, apparently on account of Defendants' intentional efforts to frustrate

service, see Docket ## 3-5, the Court permitted Plaintiff to "proceed with this action, without prejudice to Defendants to challenge service." Docket # 5.

On October 21, 2010, the Court issued an order to show cause as to why default judgment should not be entered against the Defendants. Docket # 9. On December 9, 2010, upon Defendants' failure to answer the complaint or respond to the order to show cause, the Court entered a default judgment against Defendants in an amount to be determined at an inquest hearing to be conducted by a magistrate judge. Docket # 12. Your Honor then referred the case to the undersigned for the purpose of conducting an inquest. Docket # 10.

Having completed the inquest – which has included (1) an analysis of the allegations and causes of action set forth in the Complaint, and (2) review of Plaintiff's Proposed Findings of Fact and Conclusions of Law and related materials – and for the reasons set forth below, I conclude that the allegations set forth in the complaint do not support a finding of liability as to any of Plaintiff's causes of action, and that, in any event, Plaintiff fails to establish damages. Because it appears that the defects underlying at least some of Plaintiff's claims could be cured through an amended pleading, I respectfully recommend that the Court **DISMISS THE COMPLAINT WITHOUT PREJUDICE**.

## II.    BACKGROUND

EGA is a Delaware limited liability company for which Richard Yahya ("Yahya") is the managing director. Defendant ETCH is a private bank based in Indiana for which Anderson is the managing director. In 2009, Yahya and Anderson entered into discussions regarding investment in the international monetary markets, and as a result of those discussions EGA and ETCH entered into an investment joint venture. The instant litigation arises out of that relationship.

2

Yahya initially approached Anderson because he was told that ETCH was the assignee of three foreign "bank guarantees" in the aggregate amount of €1.72 billion. Anderson offered to use those foreign "bank guarantees" to secure a line of credit on behalf of a joint venture to be formed between EGA and ETCH, the proceeds of which could then be invested in the international monetary markets.[1]  The parties tentatively agreed to form such a joint venture, and further agreed that profits from the contemplated investment activity were to be shared evenly between them.  In furtherance of this informal agreement, EGA offered to arrange a business relationship between the putative joint venture and a "financial facility" that could (1) obtain a line of credit backed by the Guarantee, and (2) engage in the contemplated trading activity.

Yahya proposed that the putative joint venture obtain its line of credit through two separate entities – Uniti Capital Corp., LLC ("Uniti") and Fundacion Paraiso Sin Fronteras ("FP") – and that Uniti carry out the investment activity once the line of credit had been obtained.[2]  Although Yahya was previously acquainted with Uniti and FP, Anderson was not. Therefore, Yahya introduced Anderson to the principals of Uniti (Louis Muro ("Muro")) and FP (Marzabel), and subsequently prepared various documents intended to facilitate the formation of

---

[1] Plaintiff has provided the Court with what it describes as two separate "bank guarantees" issued by a foreign branch of Deutsche Bank in favor of non-party Rosabranca International Corporation in the aggregate amount of €1.5 billion.  Plaintiff also has provided the Court with a third "bank guarantee" issued by Deutsche Bank in favor of non-party Bladick Corporation S.A. in the amount of €220 million.  Plaintiff alleges that ETCH took each of the three "bank guarantees" (collectively, the "Guarantee") by assignment from Rosabranca and Bladick. Compl. ¶ 23.

[2] In the Complaint, Plaintiff identifies Uniti as a Canadian-based "manager for trading platforms" and an "asset manager" that had previously worked with FP.  Although the Complaint does not explain FP's business or its specific role with respect to the investment scheme discussed herein, Plaintiff claims that FP's president, Manuel Aniceto Marzabal ("Marzabel"), told Yahya that FP was "the key element in obtain [sic] line of credit from certain banks."  The Complaint does not expound upon the meaning of that statement, or upon FP's actual role in obtaining or attempting to obtain a line of credit.

the joint venture, the establishment of the line of credit, and commencement of the contemplated

investment activity.

Specifically, on June 24, 2009, Anderson executed two separate documents, both drafted

by Yahya, and both styled as "letters of intent" between ETCH and FP.  In the "letters of intent,"

Anderson (1) "attest[s] and warrant[s]" that the Guarantee is on deposit and backed by funds that

are immediately available and under Anderson's exclusive "signatory control"; and (2) purports

to "grant [FP] an exclusive right to provide me with the best available Private Placement

Transaction to facilitate the private placement of this Bank Guarantee(s) in order to obtain an

LTV against the said instruments."  Exs. D-E (Letters of Intent).[3]  FP did not sign either of these

so-called "letters of intent," and Plaintiff has not alleged that ETCH and FP ever entered into any

binding agreement with respect thereto.

Following Anderson's execution of the so-called "letters of intent," and in keeping with

their previous discussions, EGA and ETCH formed an investment joint venture on July 27, 2009

that was to last for a period of one year and one day (the "Joint Venture").[4]  The terms of that

Joint Venture are reflected in a written agreement prepared by Yahya and signed by Anderson

(the "Agreement").  As the parties had previously discussed, the Agreement contemplates that

---

[3] References to "Ex." are to the specified exhibit(s) attached to the affidavit of Richard Yahya in support of Plaintiff's Proposed Findings of Fact and Conclusions of Law.  Docket # 20.

[4] The legal consequences of a joint venture are almost identical to those of a partnership, Margate Indus., Inc. v. Samincorp, Inc., 582 F. Supp. 611, 620 (S.D.N.Y. 1984), and a joint venture under New York law is governed by rules substantially the same as the rules applicable to partnerships.  See Ebker v. Tan Jay Int'l, Ltd., 741 F. Supp. 448, 468 (S.D.N.Y. 1990); Gramercy Equities Corp. v. Dumont, 72 N.Y.2d 560, 565 (N.Y. 1988) (a joint venture "is in a sense a partnership for a limited purpose, and it has long been recognized that the legal consequences of a joint venture are equivalent to those of a partnership").  Accordingly, although the Agreement is styled as a "joint venture agreement," the Court's analysis of the relationship between EGA and ETCH, where applicable, is governed by principles of partnership law.  Id. The Court notes that, in at least two instances, the Agreement refers to the parties as "joint venture partners."  Ex. F (Agreement), at "Whereas" Clause "c," and Article 2.

the Joint Venture would obtain a bank line of credit in an unspecified amount, which was to be collateralized by the Guarantee. The Agreement identifies the Guarantee as ETCH's "contribution" to the Joint Venture. Ex. H. (Agreement), Article 4.

The Agreement further contemplates that an unidentified "banking entity" would invest the proceeds from the line of credit on behalf of the Joint Venture, and that that the profits from this investment activity would be shared evenly by the parties. Although the line of credit was to serve as the sole source of capital for the Joint Venture's investment activity, the Agreement explicitly states that the Guarantee itself "will always remain the exclusive property of [ETCH]." Ex. H (Agreement), Article 5. The Agreement also states that the "corporate activities of the Joint Venture will be exclusively managed by EGA." Id. at Article 12.

On the same day that Anderson executed the Agreement, he also executed another document drafted by Yahya styled as a "Resolution of [ETCH's] Board of Directors" (the "Resolution"). In the Resolution, ETCH's board "granted" Uniti "full signatory authority, to negotiate . . ., execute and enter into a Contract for a [sic] arranging a line of credit against the . . . Bank Guarantee(s)." Ex. G (Resolution). The Resolution further authorized Uniti to engage in various acts that "will best suit the investment of these funds." The Resolution makes no reference to EGA, Yahya, or the Joint Venture.

Plaintiff has provided the Court with a partially executed copy of an "Asset Management Agreement" between ETCH and Uniti dated August 5, 2009. Ex H (Agreement).[5] Although the signature block to the Asset Management Agreement requires the signatures of Anderson (on behalf of ETCH), Muro (on behalf of Uniti), and Marzabal (on behalf of FP), Muro was the only

---

[5] Although FP is not identified as a party to the Asset Management Agreement, the document expressly indicates that Uniti would be carrying out its duties thereunder "in collaboration with" FP.

one to sign it.[6]  The stated purpose of the Asset Management Agreement was for Uniti to "trad[e]"

against" the Guarantee on behalf of ETCH.  To that end, the Asset Management Agreement

contemplates that Uniti would have "the right to identify and negotiate various transactions

individually and/or in connection with other reputable entities, in whatever form, and with full

authority to act on ETCH's behalf."  The Asset Management Agreement further contemplates

that Uniti would obtain a minimum return on investment of sixty percent (60%), and that these

returns would be "paid to ETCH on a Five day cycle . . . ."  Like the Resolution, the Asset

Management Agreement makes no reference to EGA, Yahya, or the Joint Venture.

Relying on this partially executed Asset Management Agreement, Plaintiff alleges that

"ETCH and Uniti entered into a [sic] Asset Management Agreement, in collaboration with [FP],

the purpose of which was to give Uniti exclusive status as Investment Director for a minimum

period of one year for the purpose of trading against the Bank Guarantees."  Compl. ¶ 34.  Even

though EGA, Yahya and the Joint Venture are not mentioned anywhere in the Asset

Management Agreement, and even though the Asset Management Agreement expressly states

that payments thereunder were to be made "to ETCH," Plaintiff characterizes the proceeds of

that agreement as belonging to "the ETCH/EGA Joint Venture."  Id. at ¶ 37.

Plaintiff further alleges, on the basis of information and belief, that "payments from Uniti

to the Joint Venture [under the Asset Management Agreement] were to commence in September

2009."  Id. at ¶ 38.  Plaintiff does not allege that Uniti actually obtained a line of credit backed

by the Guarantee, that Uniti actually engaged in any investment activity, that Uniti actually

generated profits as a result of trading activity (let alone 60% profits), or that Uniti ever made

payments to the Joint Venture (or to any other person or entity) pursuant to the Asset

---

[6] Even though the cover page to the Asset Management Agreement bears the date of August 5, 2009, Muro's signature is dated May 8, 2009.

Management Agreement. Instead, Plaintiff alleges that when Yahya approached Anderson in December 2009 for an explanation as to why no funds had been deposited into an account for the Joint Venture, Anderson told him that "Muro had closed the Uniti Trading Account and had fled with the funds to Italy." Compl. ¶ 39.[7]

When Plaintiff's attempts to obtain additional information from Anderson and Muro regarding the so-called Uniti Trading Account proved to be unsuccessful, Plaintiff commenced the present action in this Court, asserting claims against Defendants for fraud, breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing, conversion, unjust enrichment, and an accounting. In the complaint, Plaintiff seeks to recover €1.72 billion in damages, together with punitive damages of $1 billion and other relief.

## III.   **DISCUSSION**

### A.   Default

When a defendant defaults, the court must accept all well-pleaded allegations in the complaint as true, except those pertaining to the amount of damages. Fed. R. Civ. P. 8(b)(6); Finkel v. Romanowicz, 577 F.3d 79, 83 n.6 (2d Cir. 2009). However, the Court "is also required to determine whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law." Id. at 84. This is because "even after [a] default, . . . it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." In re Industrial Diamonds Antitrust Litig., 119 F. Supp. 2d 418, 420 (S.D.N.Y. 2000) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2688, at 63 (3d ed. 1988)). Thus, "a district court retains discretion under [Federal Rule of Civil Procedure] 55(b)(2) once a default is determined to

---

[7] Plaintiff also alleges, however, that a "subsequent investigation" by Yahya "demonstrated that the Uniti Account . . . was still open and that Muro was still doing business in Uniti's Canadian office." Plaintiff has not provided any additional details regarding these allegations.

require proof of necessary facts and need not agree that the alleged facts constitute a valid cause

of action . . . ." Id. (quoting Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)).

In order to ascertain the amount of damages, the court must conduct an inquiry sufficient

to establish them to a "reasonable certainty," Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183

F.3d 151, 155 (2d Cir. 1999), and documentary evidence can suffice in lieu of an evidentiary

hearing. Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d Cir. 1991). "Even in the

absence of a hearing, however, the district court cannot simply rely on the plaintiff's statement of

damages; there must be a basis upon which the court may establish damages with reasonable

certainty. Magistrate judges and district courts have interpreted this to mean that, even when the

defendant defaults and is not present to object, damages must be based on admissible evidence."

House v. Kent Worldwide Mach. Works, Inc., 359 Fed. Appx. 206, 207 (2d Cir. 2010) (internal

citation omitted) (compiling cases).

Moreover, any damages awarded following a default judgment cannot exceed the amount

stated in the complaint's prayer for relief. See Fed. R. Civ. P. 54(c) ("A default judgment must

not differ in kind from, or exceed in amount, what is demanded in the pleadings."). This is true

even where, as here, the complaint contains a demand for a specific amount of damages, together

with a broadly-worded request for "such further relief as may be just." Compl., pgs. 16-17. As

explained by the Second Circuit:

> By limiting damages to what is specified in the 'demand for judgment,' [Federal
> Rule 54(c)] ensures that a defendant who is considering default can look at the
> damages clause, satisfy himself that he is willing to suffer judgment in that
> amount, and then default without the need to hire a lawyer. . . . [L]anguage . . .
> seeking 'such other and further relief as the court may deem proper' is mere
> boilerplate, . . . .' Whatever its import in contexts, this formulaic language cannot
> substitute for the meaningful notice called for by Rule 54(c).

Silge v. Merz, 510 F.3d 157, 160-61 (2d Cir. 2007).

B.    The Inquest

On December 14, 2010, I issued a scheduling order, Docket # 13 ("Scheduling Order"),

directing Plaintiff to file and serve proposed findings of fact and proposed conclusions of law,

and directing Defendants, thereafter, to file and serve a response thereto.  The Scheduling Order

further provided:

> The Court hereby notifies the parties that it may conduct this inquest based solely
> upon the written submissions of the parties.  See Fustok v. ContiCommodity
> Servs, Inc., 873 F.2d 38, 40 (2d Cir. 1989).  To the extent that any party seeks an
> evidentiary hearing on the issue of damages (or other monetary relief), such party
> must set forth in its submission the reason why the inquest should not be
> conducted based upon the written submissions alone, including a description of
> what witnesses would be called to testify at a hearing and the nature of the
> evidence that would be submitted.

Id.  On March 11, 2011, Plaintiff filed Proposed Findings of Fact and Conclusions of Law,

accompanied by supporting affidavits and exhibits.  Docket # 20.  Plaintiff did not request an

evidentiary hearing.  Id.  Although the complaint seeks €1.72 billion in damages, in addition to

an additional $1 billion in punitive damages and other relief, Plaintiff's Proposed Findings of

Fact and Conclusions of Law seek damages in excess of €4.25 billion in damages, exclusive of

the other types of relief set forth in the complaint.  Defendants have not made any submission to

the Court in response to Plaintiff's Proposed Findings of Fact and Conclusions of Law.

C.    Recommendations As To Liability and Damages

Although Defendants' default constitutes an admission of the factual allegations set forth

in the complaint, I conclude (1) that the facts set forth in the complaint do not, as a matter of law,

support a finding of liability as to any of Plaintiff's claims, and (2) that, in any event, the

documentary evidence submitted by Plaintiff does not provide a sufficient basis from which the Court can reasonably ascertain damages.[8]

### 1.   Fraud

Under New York law, the elements of common law fraud are: "(1) a material representation or omission of fact; (2) made with knowledge of its falsity; (3) with scienter or an intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) such reliance caused damage to the plaintiff." Dover Ltd. v. A.B. Watley, Inc., 423 F. Supp. 2d 303, 327 (S.D.N.Y. 2006) (citations omitted). "Claims of common law fraud must satisfy the requirements of Rule 9(b)," Healthcare Fin. Group v. Bank Leumi USA, 669 F. Supp. 2d 344, 348 (S.D.N.Y. 2009), meaning that the complaint must (1) specify the alleged fraudulent statements; (2) identify the speaker; (3) state where, when and to whom the statements were made; and (4) explain why the statements were fraudulent. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993). A plaintiff must also "allege facts that give rise to a strong inference of fraudulent intent." See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). "If a plaintiff fails to satisfy the requirements of Rule 9(b), entry of default judgment should be denied." 3801 Beach Channel, Inc. v. Shvartzman, 05-CV-0207 (CBA) (JO), 2010 U.S. Dist. LEXIS 142436, *14 (E.D.N.Y. Sept. 20, 2010).

"In a fraud action, a plaintiff may recover only the actual pecuniary loss sustained as a direct result of the wrong. Under this rule, the actual loss sustained as a direct result of fraud that induces an investment is the 'difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the

---

[8] Even though I recommend dismissal of the complaint on these grounds, I note that Plaintiff's claim for damages could not, in any event, exceed the amount demanded in the complaint. See Fed. R. Civ. P. 54(c); Silge, 510 F.3d at 160-61. Therefore, my analysis disregards claims to damages that exceed €1.72 billion.

bargain.'  The damages are to compensate plaintiffs for what they lost because of the fraud, not

for what they might have gained." Continental Cas. Co. v. PricewaterhouseCoopers, LLP, 933

N.E.2d 738, 742 (N.Y. 2010) (internal citations omitted); see also Eugenia VI Venture Holdings,

Ltd. v. Glasser, 370 Fed. Appx. 197, 199 (2d Cir. 2010) ("We also agree with the district court

that [plaintiff's] claims for fraudulent inducement, fraud, and aiding and abetting fraud fail as a

matter of law because [plaintiff] suffered no out-of-pocket loss.").  Under this "out-of-pocket

rule" of damages, "there can be no recovery of profits which would have been realized in the

absence of fraud." Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421 (N.Y. 1996); cf.

MTI/The Image Grp., Inc. v. Fox Studios East, Inc., 690 N.Y.S.2d 576, 578 (N.Y. App. Div. 1st

Dep't 1999) ("Lost profits are not recoverable under a fraud theory.").  However, "[t]he Second

Circuit has said that, in addition to out-of-pocket damages, plaintiffs may recover consequential

damages for fraud claims which include 'the costs incurred in preparing for, performing, or

passing up other business opportunities.'" A.I.A. Holdings, S.A. v. Lehman Brothers, Inc., 97

Civ. 4978 (LMM), 2002 U.S. Dist. LEXIS 10848, *11-12 (S.D.N.Y. June 17, 2002) (citing

Commerzanstalt v. Telewide Sys., 880 F.2d 642 (2d Cir. 1989)).

      Plaintiff's fraud claim should be dismissed because, even when accepting all of the

allegations in the complaint as true, Plaintiff does not claim to have sustained any out-of-pocket

or consequential damages. Finkel, 577 F.3d at 84.  Instead, Plaintiff seeks to recover €4.25

billion in lost profits that it claims resulted from Defendants' allegedly fraudulent conduct. See,

e.g., Ex. L (Damages Schedule) (describing Plaintiff's damages as "EGA Profit Under

EGA/ETCH Joint Venture Agreement").  But lost profits are not recoverable under New York

law in an action for fraud. MTI/The Image Grp., Inc., 690 N.Y.S.2d at 578; Continental Cas.

Co., 933 N.E.2d at 742; Lama Holding Co., 88 N.Y.2d at 421.  Because Plaintiff has failed to

allege damages that are compensable under New York law with respect to its claim of fraud, that claim must be dismissed as a matter of law. Eugenia VI Venture Holdings, Ltd., 370 Fed. Appx. at 199.[9]

        2.    <u>Breach of Contract</u>

To establish a breach of contract under New York law, a plaintiff must show the existence of a contract, performance by one party, breach by the other party, and damages. Rosenblatt v. Christie, Manson & Woods, 195 Fed. Appx. 11, 12 (2d Cir. 2006). As a general rule under New York law, "the proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of the breach." Simon v. Electrospace Corp., 269 N.E.2d 21, 26 (N.Y. 1971). Because New York law aims to place the non-breaching party in as good a position as it would have occupied but for the breach, Xand Corp. v. Reliable Sys. Alternatives Corp., 880 N.Y.S.2d 333 (N.Y. App. Div. 2d Dep't 2009), lost profits may be awarded for breach of contract where they are a natural consequence of the breach, where that measure of damages was contemplated by the parties when the contract was formed, and where the lost profits are capable of reasonably accurate measurement. See, e.g., Ashland Mgmt., Inc. v. Janien, 624 N.E.2d 1007, 1010-11 (N.Y. 1993).

Here, Plaintiff claims that Defendants breached the Agreement by failing to distribute profits of the Joint Venture, and that this breach entitles Plaintiff to recover lost profits in excess of €4.25 billion. Although lost profits generally are recoverable in an action for breach of

---

[9] The Court notes that Plaintiff's fraud claim is deficient in several other respects, including (1) failure to meet the heightened pleading requirements of Federal Rule 9(b), (2) failure to demonstrate detrimental reliance upon Defendants' alleged misstatements and omissions, (3) failure to demonstrate the materiality of the alleged misstatements and omissions; and (4) failure to demonstrate scienter. However, because I recommend dismissal of Plaintiff's fraud claim due to its failure to allege a compensable type of damages, my analysis does not reach these other deficiencies.

contract, <u>Ashland Mgmt., Inc.</u>, 624 N.E.2d at 1010-11, Plaintiff's contract claim must be dismissed because Plaintiff fails to establish that Defendants breached the Agreement.

Plaintiff makes the conclusory allegation that Defendants breached the Agreement by "acting in a manner inconsistent with [their] duties and obligations" thereunder, and claims that this conduct "prevented EGA from receiving its portion of the Joint Venture profits." Noticeably absent from the complaint, however, is any allegation that the Joint Venture actually received profits. In other words, Plaintiff seeks to hold Defendants liable for failing to distribute "profits" it does not even allege came to exist. Such allegations cannot support a finding of liability.

Indeed, Plaintiff does not allege that the Agreement obligated Defendants to earn a profit on behalf of the Joint Venture, or that Defendants somehow guaranteed that the Joint Venture would realize such a profit. Rather, Plaintiff alleges that Defendants failed to distribute the profits of the Joint Venture, thereby implying – without specifically alleging – that the Joint Venture actually realized a profit. However, Plaintiff has not alleged that Uniti ever obtained a line of credit against the Guarantee, that it ever engaged in the contemplated trading activity, or that it ever earned an actual profit. Instead, Plaintiff merely points to the Asset Management Agreement between ETCH and Uniti, and alleges – on the basis of information and belief – that "payments from Uniti to the Joint Venture ***were to commence*** in September 2009." Compl. ¶ 38 (emphasis added). Because Plaintiff has not alleged that the Joint Venture ***actually*** made a profit, and has presented no evidence to that effect, this Court cannot conclude that Defendants breached the Agreement by failing to distribute profits.

Moreover, for purposes of establishing damages to a degree of reasonable certainty, as is required at this stage of the proceedings, <u>Credit Lyonnais Sec. (USA), Inc.</u>, 183 F.3d at 155, it is not sufficient for Plaintiff to allege, on the basis of information and belief, that payments under

the Asset Management Agreement "were to commence in September 2009." At most, this allegation establishes that the Asset Management Agreement obligated Uniti to begin making payment to ETCH[10] as of that date. Since Plaintiff has made no allegation that Uniti actually did make such payments, either to the Joint Venture or ETCH, this Court has no basis to make any findings – let alone to a reasonable certainty – as to Plaintiff's alleged damages.

For both of the foregoing reasons, Plaintiff's claim for breach of contract should be dismissed.

3.     Breach of Fiduciary Duty

The elements of a breach of fiduciary duty claim are (1) that a fiduciary duty existed between plaintiff and defendant, (2) that defendant breached that duty, and (3) damages as a result of the breach. Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d Cir. 1986); Regions Bank v. Wieder & Mastroianni, P.C., 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006), remanded on other grounds by 253 Fed. Appx. 52 (2d Cir. 2007).

It is well established that partners and joint venturers owe each other fiduciary duties. See, e.g., Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 972-73 (2d Cir. 1989) (discussing fiduciary duty of partners under New York law); Pace v. Perk, 440 N.Y.S.2d 710, 716 (N.Y. App. Div. 2d Dep't 1981) ("[Partners] owe a duty of exercising the utmost good faith,

---

[10] Several of Plaintiff's claims imply – without specifically alleging – that monies allegedly paid to ETCH under the Asset Management Agreement were, in reality, property of the Joint Venture. Although such an outcome could, under different circumstances, be reached through the imposition of a constructive trust, In re Ades & Berg Grp. Investors, 550 F.3d 240, 245 (2d Cir. 2008), that remedy is inappropriate here because (1) Plaintiff has not requested a constructive trust at any stage of these proceedings, Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."); and in any event (2) Plaintiff has failed to demonstrate (or even allege) that ETCH actually received any money or property pursuant to the Asset Management Agreement. See Majutama v. Drexel Burnham Lambert Grp., 142 B.R. 633, 637 (S.D.N.Y. 1992) ("the party asserting existence of a constructive trust bears the burden of demonstrating that a trust res exists").

fairness and loyalty to their copartners."); Indep. Asset Mgmt. LLC v. Zanger, 2008 U.S. Dist. LEXIS 51445 (S.D.N.Y. June 13, 2008) ("As a matter of New York law, joint venturers owe each other a fiduciary duty."). "Although there is no set formulation of the fiduciary duties of partners," Newburger, Loeb & Co. v. Gross, 563 F.2d 1057, 1078 (2d Cir. 1977), "it is beyond cavil that a partner's diversion of partnership funds for personal use, if proved, constitutes a breach of that partner's fiduciary duty. A general partner is also liable for losses caused by fraud, culpable negligence, wilful disregard of duty or bad faith." Colmer v. Eady, No. 81 Civ. 5917 (NRB), 1982 U.S. Dist. LEXIS, *7-8 (S.D.N.Y. Nov. 3, 1982) (citations omitted).

Lost profits are recoverable under New York law for breach of fiduciary duty. See American Fed. Grp. v. Rothenberg, 136 F.3d 897, 907 (2d Cir. 1998) (citing Stoeckel v. Block, 566 N.Y.S.2d 625, 626 (App. Div. 1st Dep't 1991)). In order to recover damages for lost earnings or profits on a claim for breach of fiduciary duty, "one must prove with certainty that the loss was caused by a breach of . . . fiduciary duty and must prove with reasonable certainty, though not mathematical precision, the amount of the loss." Am. Fed. Grp. v. Rothenberg, 136 F.3d 879, 907-08 (2d Cir. 1998) (citations omitted). However, "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." Cal Distrib. Inc. v. Cadbury Schweppes Americas Beverages, Inc., 06 Civ. 0496 (RMB) (JCF), 2007 U.S. Dist. LEXIS 854, *28 (S.D.N.Y. Jan. 5, 2007) (citing William Kaufman Organization, Ltd. v. Graham & James LLP, 703 N.Y.S.2d 439, 442 (N.Y. App. Div. 1st Dep't 2000)).

Plaintiff's claim for breach of fiduciary duty must be dismissed because, with one exception, the claim is entirely duplicative of Plaintiff's breach of contract claim. Although Plaintiff's claims for breach of fiduciary duty and breach of contract are styled as separate legal violations, they are identical in substance. Indeed, both claims are premised upon the same facts

and seek the same damages for the same alleged conduct. Compare Compl. ¶¶ 62-63

(Defendants breached the Agreement, causing damages in the amount of €1.72 billion, when

Defendants "prevented EGA from receiving its portion of the Joint Venture profits" under the

Agreement and "deal[t] directly with Uniti and [FP] instead of through EGA") with Compl. ¶¶

68-70 (Defendants breached their fiduciary duties, causing damages in the amount of €1.72

billion, by "misappropriating" and "diverting Joint Venture Profits to Defendants" due to

Plaintiff under the Agreement and "dealing directly with Uniti and [FP]"). Because Plaintiff's

fiduciary duty claims are duplicative of its contract claims, the fiduciary duty claims must be

dismissed. Cal Distrib. Inc., 06 Civ. 0496 (RMB) (JCF), 2007 U.S. Dist. LEXIS 854, at *28.

Plaintiff's fiduciary duty claim does differ from its contract claim in one respect. Unlike

the allegations underlying its contract claim, Plaintiff's fiduciary duty claim seeks to recover

damages based upon "Defendants' theft of at least €1.72 Billion from Plaintiff." Compl. ¶ 71.[11]

To the extent that Plaintiff is attempting to claim that Defendants breached their fiduciary duties

by converting the Guarantee, that claim fails for the reasons set forth below in Section III.C.5.

Additionally, a claim of conversion requires the "'exercise of unauthorized dominion over the

property of another in interference with a plaintiff's legal title or superior right of possession.'"

Citadel Mgmt. Inc., 123 F. Supp. 2d at 147. Here, Plaintiff cannot demonstrate "legal title or

superior right of possession" with respect to the Guarantee it accuses Defendants of stealing, as

there is no dispute that the Guarantee was at all times the "exclusive property" of ETCH. See

Ex. H (Agreement), Article 5 (the Guarantee "will always remain the exclusive property of

---

[11] Although Plaintiff does not expound upon the basis for this claim, it is well-settled that
"'[t]heft' is not a claim under New York Law." Ho Myung Moolsan Co. v. Manitou Mineral
Water, Inc., 665 F. Supp. 2d 239, 257 (S.D.N.Y. 2009) (citing Arts4All, Ltd. v. Hancock, 773
N.Y.S.2d 348, 353 (N.Y. App. Div 1st Dep't 2004)).

[ETCH]"). As such, Plaintiff's claim of "theft" cannot form the basis for an actionable fiduciary duty claim. Id.

        4.      <u>Breach of Duty of Good Faith and Fair Dealing</u>

New York law implies a covenant of good faith and fair dealing in every contract, <u>Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.</u>, 610 F.3d 44, 54 (2d Cir. 2010), and this includes partnership and joint venture agreements. <u>Gelder Med. Grp. v. Webber</u>, 363 N.E.2d 573, 577 (N.Y. 1977). The covenant of good faith and fair dealing "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." <u>Filner v. Shapiro</u>, 633 F.2d 139, 143 (2d Cir. 1980). "[B]reach of the covenant of good faith and fair dealing require[s] proof of 1) fraud, 2) malice, 3) bad faith, 4) other intentional wrongdoing, or 5) reckless indifference to the rights of others such as gross negligence." <u>T.P.K. Constr. Corp. v. Southern Am. Ins. Co.</u>, 752 F. Supp. 105, 112 (S.D.N.Y. 1990). However, "breach of that duty is merely a breach of the underlying contract." <u>Geler v. National Westminster Bank USA</u>, 770 F. Supp. 210, 215 (S.D.N.Y. 1991), meaning that "[t]he duty of good faith and fair dealing and any breaches of that duty necessarily arise from an existing contract." <u>St. Paul Fire & Marine Ins. Co. v. Health Fielding Ins. Brokering</u>, 91 Civ. 0748 (MJL), 1993 U.S. Dist. LEXIS 7066, *25 (S.D.N.Y. May 25, 1993).

As such, New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." <u>See Harris v. Provident Life & Accident Ins. Co.</u>, 310 F.3d 73, 81 (2d Cir. 2002); <u>Cary Oil Co. v. MG Refining and Marketing, Inc.</u>, 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000) ("Under New York law, a claim for breach of the implied covenant will be dismissed as duplicative if the conduct allegedly violating the implied covenant is also the predicate for

breach of the underlying contract."). Accordingly, "'[e]very court faced with a complaint brought under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing has dismissed the latter claim as duplicative.'" Ari & Co. v. Regent Int'l Corp., 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003).

Here, Plaintiff's claim for breach of duty of good faith and fair dealing must be dismissed because it is duplicative of Plaintiff's contract claim. Id.

 5. Conversion

The tort of conversion is defined as the "'exercise of unauthorized dominion over the property of another in interference with a plaintiff's legal title or superior right of possession.'" Citadel Mgmt. Inc. v. Telesis Trust, Inc., 123 F. Supp. 2d 133, 147 (S.D.N.Y. 2000) (quoting Lopresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997)). Under New York law, a plaintiff must plead the following in order to assert a claim of conversion: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (quotation and citation omitted). Money may be subject to a conversion action so long as it is held in a "specific, identifiable fund and [subject to] an obligation to return or otherwise treat in a particular manner the specific fund in question." Id. (quotation omitted).

However, it is well settled under New York law that "an action for conversion cannot lie where damages are merely sought for breach of contract." Citadel Mgmt. Inc., 123 F. Supp. 2d at 148. "For a conversion claim to succeed in the context of a dispute regarding a contract, the breach of contract must result in some 'wrong' that is separately actionable." Id.; see also Fraser

v. Doubleday & Co., 587 F. Supp. 1284, 1288 (S.D.N.Y. 1984) ("[T]o sustain a conversion

claim, a plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that

are a mere violation of contractual rights.").

        Courts in this district routinely dismiss conversion claims where they overlap with

contractual claims seeking the same relief. See, e.g., AD Rendon Communs., Inc. v. Lumina

Ams., Inc., Case No. 04-CV-8832 (KMK), 2006 U.S. Dist. LEXIS 37600, *5-7 (S.D.N.Y. June

7, 2006) (Karas, J.) ("Plaintiff's conversion claim is just another way of recovering for

Defendant's alleged breach of the Agreement, and must be dismissed."); Elias v. Albanese, 00

Civ. 2219 (JSR), 2000 U.S. Dist. LEXIS 11929, *14 (S.D.N.Y. Aug. 18, 2000) ("a conversion

claim is precluded by the contract claim embodied in Count Three") (citing Newburger, Loeb &

Co., Inc. v. Gross, 563 F.2d 1057, 1076 n.23 (2d Cir. 1977) (in an ongoing partnership, "a

partner may not sue another partner at law for conversion of or injury to partnership property"),

cert. denied, 434 U.S. 1035 (1978)).

        Plaintiff's conversion claim must be dismissed because it too is duplicative of Plaintiff's

contract claim. Indeed, Plaintiff predicates its conversion claim upon the assertion that

"Defendants wrongfully obtained, and wrongfully continue to exercise dominion and control

over, Plaintiff's assets in a manner which is inconsistent with Plaintiff's rights." Compl. ¶ 80.

The "rights" to which Plaintiff refers are the ones afforded to it under the Agreement, and the

"assets" to which Plaintiff refers are the profits it claims it is entitled to receive under the

Agreement. Plaintiff may not recover, under the guise of a conversion claim, the exact same

damages it is unable to recover through its contract claim. See, e.g., AD Rendon Communs.,

Inc., Case No. 04-CV-8832 (KMK), 2006 U.S. Dist. LEXIS 37600, at *5-7 (Karas, J.)

("Plaintiff's conversion claim is just another way of recovering for Defendant's alleged breach of the Agreement, and must be dismissed.").

      6.     Unjust Enrichment

Under New York law, a plaintiff claiming unjust enrichment must plead and prove (1) that the defendant was enriched, (2) that the enrichment was at the plaintiff's expense, and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff. Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 519 (2d Cir. 2001). A claim for unjust enrichment "lies as a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement.*" Beth Israel Medical Center v. Horizon Blue, 448 F.3d 573, 587 (2d Cir. 2006) (emphasis in the original).

"Under New York law, it is improper to seek damages for unjust enrichment 'in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.'" Las Olas Investor Grp., LLC v. Las Olas Tower Co., 06 Civ. 7781 (SHS)(FM), 2008 U.S. Dist. LEXIS 661, *5 (S.D.N.Y. Jan 2, 2008) (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987)). Thus, while a plaintiff may simultaneously allege breach of contract and unjust enrichment in its complaint, the courts generally will allow the alternate theories to proceed only "where there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue . . . ." Joseph Sternberg, Inc. v. Walber 36th Street Assoc., 187 A.D.2d 225, 228 (N.Y. App. Div. 1st Dep't 1993), quoted in Bazak Intern. Corp. v. Tarrant Apparel Group, 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004).

Recovery on an unjust enrichment claim is "limited to the reasonable value of the services rendered by the plaintiff." Giordano v. Thompson, 564 F.3d 163, 170 (2d Cir. 2009) (quoting Collins Tuttle & Co. v. Leucadia, Inc., 544 N.Y.S.2d 604, 605 (App. Div. 1st Dep't 1989)); see also Pereira v. Farace, 413 F.3d 330, 340 (2d Cir. 2005) ("[R]estitution is measured by a defendant's 'unjust gain, rather than [by a plaintiff's] loss.'").

Here, Plaintiff predicates its unjust enrichment claim upon Defendants' "withholding from Plaintiff the profits due Plaintiff under the Joint Venture Agreement." Compl. ¶ 83. This claim must be dismissed because, as a result of Defendants' default, there is no dispute as to the validity of the Agreement, which clearly covers the dispute between the parties. Under such circumstances, it would be improper for this Court to permit recovery on the basis of unjust enrichment. See Las Olas Investor Grp., LLC, 06 Civ. 7781 (SHS)(FM), 2008 U.S. Dist. LEXIS 661, at *5.

       7.    Accounting

An accounting is an equitable remedy entitling a principal to require his fiduciary to show what the fiduciary did with the principal's property or money. See Wilde v. Wilde, 576 F. Supp. 2d 595, 607 (S.D.N.Y. 2008). To obtain an accounting under New York law, a plaintiff must show: "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009).

I recommend that the Court deny Plaintiff's request for an accounting because, among other reasons, Plaintiff has not demonstrated that "money or property [has been] entrusted to the

defendant imposing upon him a burden of accounting." <u>IMG Fragrance Brands, LLC</u>, 679 F.

Supp. 2d at 411.

## IV.   <u>Conclusion</u>

For the foregoing reasons, I conclude (1) that the allegations set forth in the complaint

fail to establish liability as to any of Plaintiff's claims, and (2) that Plaintiff fails to establish

damages to a reasonable degree of certainty.  However, because it appears that at least some of

the defects underlying Plaintiff's complaint may be curable through an amended pleading

pursuant to Federal Rule 15, I respectfully recommend that the complaint be **DISMISSED**

**WITHOUT PREJUDICE**.

## V.   <u>Notice</u>

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties

shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d),

or a total of seventeen (17) working days, from the date hereof to file written objections to this

Report and Recommendation.  Fed. R. Civ. P. 6(a).  Such objections, if any, shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Kenneth

M. Karas, United States District Judge, at the Hon. Charles L. Brieant Jr. Federal Building and

United States Courthouse, 300 Quarropas St., White Plains, NY 10601-4150, and to the

chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later

appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Karas.

Dated:   May [ ], 2011
         White Plains, N.Y.

Respectfully submitted,

PAUL E. DAVISON
UNITED STATES MAGISTRATE JUDGE